311 So.2d 86 (1975)
Charles VERRET et al., Plaintiffs-Appellants,
v.
Georgiana Carlin NORWOOD et al., Defendants-Appellees.
No. 4925.
Court of Appeal of Louisiana, Third Circuit.
April 9, 1975.
Rehearing Denied May 1, 1975.
Writ Refused June 23, 1975.
*88 J. Arthur Smith, III, Frederick W. Ellis, Baton Rouge, Hunt, Godwin, Painter & Roddy, by E. C. Hunt, Jr., Lake Charles, for plaintiffs-appellants.
Bennett & Laborde, by Benjamin C. Bennett, Jr., Marksville, Kleinpeter & George, by Robert L. Kleinpeter, Baton Rouge, Raggio, Farrar, Cappel & Chozen, by Richard A. Chozen, Lake Charles, C. Thomas Bienvenu, Jr., St. Martinville, Davidson, Meaux, Onebane & Donohoe, by Robert L. Cabes, Lafayette, Liskow & Lewis, by James L. Pelletier, Lafayette, for defendants-appellees.
Before HOOD, CULPEPPER, and MILLER, JJ.
MILLER, Judge.
Plaintiffs, the heirs of Anatole J. Verret, appeal the trial court's dismissal of their action to remove a cloud from their title. Defendants are the heirs of Charles Ashley, Thomas E. Carlin, and Joseph Broussard. We affirm.
The land involved is comprised of Lots 6, 10, and 11 of Section 33, Township 9 South, Range 9 East, and was patented to A. J. Verret on April 24, 1888. The 160 acre parcel is located in the Atchafalaya Basin in St. Martin Parish and is predominantly marsh land, unsuitable for cultivation. It is located in the southern and eastern portions of an island which measures some three miles in a north-northwesterly by south-southeasterly direction by a width of approximately one mile. Plaintiffs contend their ancestor in title, A. *89 J. Verret, exercised corporeal possession of the disputed tract when he had timber cut in 1913.
By this action, plaintiffs seek to have erased from the conveyance records several mineral leases executed by defendants affecting the disputed land. Mineral leases were granted by defendants before plaintiffs executed similar leases.
Defendants answered the suit asserting ownership by virtue of a 1906 Tax Sale to their ancestors in title, Charles Ashley, T. E. Carlin, and Joseph Broussard. Defendants' ancestors in title failed to pay taxes and in 1909 the property was adjudicated to the State for nonpayment of taxes. In 1965, defendants redeemed the land from the State and paid all parish and state taxes which accrued from and after 1908.
During trial plaintiffs filed an exception of acquisitive prescription alleging, in the alternative, ownership was acquired by possession of ten and thirty years. A similar exception was filed in this court.
The Action to Remove Cloud from Title is a creature of the jurisprudence first recognized in Lacroix v. Villio, 123 La. 459, 49 So. 20 (1909). Historically, the necessary allegations to bring this action were that 1) plaintiff claim ownership of the immovable or real right, 2) defendant has recorded an instrument casting a cloud on plaintiff's title, 3) there be a proper description of the property, and 4) plaintiff desires a cancellation of the recorded instrument from the public records. Johnson's Louisiana Real Actions (1961), pp. 69, 70.
These allegations are present. We nevertheless note that plaintiff has not sought to have cancelled the most serious clouds upon his title, that being the 1906 Tax Sale and the 1965 Redemption of the 1908 Tax Sale, both of which indicate the disputed tract belongs to defendants.
Prior to enactment of the Code of Civil Procedure in 1960, it was recommended that the Action to Remove Cloud from Title be absolished. 29 T.L.R. 617, 634, Note 59. But it was mentioned in the Code of Civil Procedure Introduction to Title II "Real Actions." In Walmsley v. Pan American Petroleum Corporation, 244 La. 513, 153 So.2d 375 (1963), it was held that the action survived passage of the Code of Civil Procedure.
We are impressed with criticisms of the Walmsley decision (24 L.L.R. 215, 229-236 (1964) Mineral Rights Symposium by George W. Hardy, III; 24 L.L.R. 291, 323 [1964] Civil Procedure Symposium by Henry G. McMahon; 26 L.L.R. 581, 597-598 [1966] Civil Procedure Symposium by Henry G. McMahon; and 38 T.L.R. 190 [1963], case note by Betty Weaver), and agree that the better view would be to restrict litigants to remedies provided in the Code of Civil Procedure. We are nevertheless bound by the Walmsley decision.
In Walmsley, the court recognized the issue of title may be determined as incidental to plaintiff's right to have the alleged cloud removed. The court, citing Daigle v. Pan American Production Co., 236 La. 578, 108 So.2d 516 (1958), went further to hold that possession in either plaintiff or defendant is immaterial in an action to remove cloud from title. Since neither plaintiff nor defendant was found to be in possession, the statement relating to the immateriality of possession may be dicta.
Walmsley does not discuss or decide the issue of burden of proof. Applicable here is LSA-C.C.P. art. 3654 and the Official Revision Comments following that article. Rules which give effect to the historic role of possession in determining the burden of proof of ownership are needed in these cases.
We hold that if "title" is at issue, although incidental to an action to remove cloud from title, possession plays the same role in determining plaintiff's burden of proof that it does in a petitory action. This burden is spelled out in LSA-C.C.P. *90 art. 3653 to require plaintiff in a petitory action to 1) make out his title thereto, if the court finds defendant in possession thereof; or 2) prove a better title thereto than defendant, if the court finds the latter not in possession.
To hold otherwise would allow a litigant to circumvent the harsh burden of proof required when defendant is in possession, by merely styling the case an action to remove cloud from title.
Defendants redeemed the property from the state in 1965 and paid all delinquent taxes plus penalties. Since 1965, defendants have paid all property taxes as they accrued. Carol Ashley (a defendant) visited the disputed property as owner at least twice a year from 1956 to 1966. From 1966 to 1968, Ashley was physically on the disputed property at least once each week. Defendants' attorney wrote Champion Paper Company on behalf of defendants demanding they stop cutting pulpwood on a portion of the disputed tract, and that company terminated its activity in that area. There is evidence indicating that in 1908 defendants' ancestors in title had a timber camp and cut timber on the disputed property. In that same year Charles Ashley bought the Broussard interest in the disputed tract.
When suit was filed, defendants were in possession of the disputed tract. Under these facts, plaintiffs have the burden to make out their title to the property. LSA-C.C.P. art. 3653(1).
Plaintiffs traced their record title back to the 1888 patent. However, to sustain their burden they were also required to prove they owned the property when suit was filed. At that time, there existed on the public records two recorded documents which affected plaintiffs' record title, these being the 1906 Tax Sale and the 1965 Redemption of the 1908 Tax Sale.
Furthermore, the burden of invalidating a tax sale if placed on the party attacking the sale. Staring v. Grace, 97 So.2d 669 (La.App. 1 Cir. 1957); Stone v. Kimball's Heirs, 199 La. 240, 5 So.2d 758 (1942); Federal Land Bank of New Orleans v. Scallan, 179 La. 636, 154 So. 632 (1934). This is based on Louisiana's public policy favoring the validity of tax sales. Staring v. Grace, supra.

Validity of 1906 Tax Sale
In 1906, Article 233 of the 1898 Constitution provided a three year peremptive period for attacking a Tax Sale. Article 10, Section 11 of the 1921 Constitution (in effect when this suit was filed) provided for a five year peremptive period. This suit was filed more than 60 years after the 1906 Tax Sale.
There are three recognized exceptions to the Constitutional peremptive periods for attacking the validity of tax sales: 1) prior payment of taxes, 2) continued physical possession by the tax debtor, and 3) no assessment of the property. Vavoline Oil Company v. Concordia Parish School Board, 216 So.2d 702 (La.App. 3 Cir. 1968); Mansfield Hardwood Lumber Co. v. Butler, 234 La. 322, 99 So.2d 129 (1958); Ashley Company, Ltd. v. Bradford, 109 La. 641, 33 So. 634 (1902).
The Tax Sale in 1906 to Ashley, Carlin, and Broussard was for unpaid taxes assessed to "unknown owners" for the years 1902, 1903, and 1904. The trial court found the 1906 Tax Sale valid, holding that if defects existed in the tax sale, they were cured by the constitutional peremption.
Plaintiffs contend the constitutional peremption does not apply and contest the validity of the Tax Sale contending 1) taxes for the years 1902, 03, and 04 were paid prior to the sale, and 2) the property was not properly assessed.
We are confronted with the fact that a number of relevant records are missing from the St. Martin Parish records.
Plaintiffs showed their ancestor in title, Anatole Verret, paid some taxes for *91 the years 1903, 04, and 05, but there is no showing that he paid the 1902 taxes or that the payments (in 03, 04, and 05) were for taxes owed on the disputed property. It has been held that partial payment of taxes for which the property was sold is sufficient to invalidate a tax sale. Thompson v. Sanders-Lenahan Lumber Co., 147 La. 860, 86 So. 310 (1920); Mecom v. Graves, 148 La. 369, 86 So. 917 (1921); Prampin v. Southern Chemical Works, 53 So.2d 210 (La.App.Orls.1951).
The key problem here is: plaintiffs were unable to show that Verret paid taxes for 1902, 03, or 04 affecting the disputed property. The fact that his widow sold another piece of St. Martin Parish property in 1918 indicates he may have owned and paid taxes on other property in 1903, 04, and 05.
Additionally, there is a general presumption that public officials properly carry out their duties so that, absent contrary evidence, it is properly presumed the tax sale would not have been made had taxes been paid. Staring v. Grace, 97 So.2d 669 (La.App. 1 Cir. 1957); Wright v. Cyprian, 96 So.2d 882 (La.App. 1 Cir. 1957).
The September 29, 1906 Tax Sale, recorded in Conveyance Book 65, page 598, Records of St. Martin Parish, specifically states the property was sold for failure of "unknown owners" to pay taxes on the described tracts for 1902, 03, and 04. We fail to find manifest error in the trial court's holding that plaintiffs failed to sustain their burden of proof to establish the taxes were paid on the disputed property for those years.
Secondly plaintiffs contend there is no proof that the disputed tract was assessed during those three years.
The land in dispute covers some 160 acres in the Atchafalaya Basin, and the same assessment procedures (which we must evaluate) were followed for thousands of acres situated in the Basin, all of which were assessed to "unknown owners" and were sold in 1906 for unpaid taxes for 1902, 03, and 04.
A sale in the name of "unknown owners" is not an absolute nullity and may be cured by the Constitutional peremption. Robinson v. Williams, 45 La.Ann. 485, 12 So. 499 (1893); Griffing v. Taft, 151 La. 442, 91 So. 832 (1922); Yuges Realty v. Jefferson Parish Developers, 205 La. 1033, 18 So.2d 607 (1944).
Furthermore, the term "no assessment" is not as broad as plaintiffs contend. The lack of an assessment is not a fault that survives peremption, unless it is based on the assertion that the property was not sufficiently described to identify it. Webber's Heirs v. Martinez, 125 La. 663, 51 So. 679, 681 (1910); see also, Ewald v. Hodges, 239 La. 883, 120 So.2d 465 (1960); Gulotta v. Cutshaw, 283 So.2d 482 (La. 1973).
Defendants introduced into evidence a copy of the St. Martin Parish Tax Assessment Roll for the year 1905, certified as having been filed with the St. Martin Parish Clerk of Court. This Assessment Roll shows a correct description of the property and contains a recapitulation of taxes assessed for the years 1902, 03, and 04 which totals the exact amount for which the property was sold at the 1906 Tax Sale. They also introduced certified copies of documents captioned "Delinquent Taxes of 1902, 1903, and 1904, Assessed to Unknown" filed in the State Comptroller's Office. These documents contain a correct property description of the disputed property and also list the delinquent taxes.
Plaintiffs rely on the fact that defendants were unable to establish that the tax roll was deposited by the assessor with the mortgage office, as required by Section 35 of Act 170 of 1898 (LSA-R.S. 47:1993). Plaintiffs contend that Gottlieb v. Babin, 197 La. 802, 2 So.2d 218 (1941); Vernon Parish Lumber Co. v. Word, 170 La. 580, 128 So. 522 (1930); and Choate v. *92 O'Brien, 163 So.2d 157 (La.App. 4 Cir. 1964), stand for the proposition that the presumption in favor of validity of an assessment is defeated if the tax role is not filed in the mortgage office. These cases don't address this issue. Additionally, plaintiffs failed to introduce evidence to show these tax rolls have not been filed. They failed to carry their burden of invalidating the tax sale.
On the basis of documents filed in the State Comptroller's Office showing "Delinquent Taxes of 1902, 1903, and 1904, Assessed to Unknown", we find no manifest error in the trial court's conclusions that plaintiffs failed to carry the burden of proving the 1906 Tax Sale was a nullity. That sale breaks plaintiffs' chain of title.
Plaintiffs cite Meridian Land & Mineral Corporation v. Bagents, 211 La. 627, 30 So.2d 563 (1947); Motty v. Broussard, 201 So.2d 293 (La.App. 3 Cir. 1967); and Tinney v. Lauve, 280 So.2d 588 (La.App. 4 Cir. 1973) as authority for their claim that once they made out their title, the burden shifted to defendants to prove the validity of the 1906 Tax Sale.
These cases do not stand for that proposition. The above cases hold that if plaintiff in a petitory action makes out his title by establishing that he has record title, then the burden of proof shifts to defendant. Proof of the recorded 1906 Tax Sale is sufficient to show that plaintiffs were divested of record title. Donaldson v. Tebault, 7 Orl.App. 331 (1910). Plaintiffs failed to carry their burden of proof.

Replicatory Pleadings
Defendants contend plaintiffs' alternative plea of acquisitive prescription of ten (LSA-C.C. art. 3478 et seq.) and thirty (LSA-C.C. art. 3499 et seq.) years is a replicatory pleading not allowed under LSA-C.C.P. art. 852.
In their original petition, plaintiffs pled ownership of the disputed property through their patent from the State of Louisiana. They pled possession of the disputed property and alleged several acts of corporeal possession, the earliest act they attempted to prove being a timber cutting in 1913. Defendants answered asserting ownership through the 1906 Tax Sale to their ancestors in title.
After trial commenced and several witnesses testified, plaintiffs filed their formal plea of prescription "In answer to defenses raised in the pleadings by defendants. . . [plaintiffs] do hereby. . . if they have not already done so, alternatively plead the prescriptions acquirendi causa of thirty (30) and of ten (10) years." In this court, plaintiffs filed another plea of prescription which omits the words "In answer to defenses raised in the pleadings by defendants."
The trial judge found the plea of prescription to be a replicatory pleading which should not be considered. However the court proceeded to discuss and dismiss the merits of plaintiffs' prescriptive claims.
We find it unnecessary to determine whether the pleas of prescription filed by plaintiffs were or were not replicatory pleadings.
LSA-C.C.P. art. 852 prohibits replicatory pleadings, and so all allegations in the answer are open to every objection of law and fact (including prescription) as if specifically pleaded. If defendant is surprised, the remedy is to seek a new trial or a continuance. Skilliman v. Jones, 3 Mart.N.S., 686 (1825); Daquin v. Coiron, 3 La. 387 (1832); Abshire v. Lege, 133 La. 254, 62 So. 667 (1913); Patton's Heirs v. Moseley, 186 La. 1088, 173 So. 772 (1937); Liberal Finance Gentilly, Inc. v. Brister, 152 So.2d 331 (La.App. 1 Cir. 1963); McNabb v. Foodtown, Inc., 143 So.2d 144 (La.App. 1 Cir. 1962). See also Deville Lumber Company v. Chatelain, 308 So.2d 428 (La.App. 3 Cir. 1975).
*93 In Abshire v. Lege, supra, where defendant set up his title by answer to a petitory action, plaintiff had the right to urge against it every objection of law or fact which she might have without pleading the same, replication not being allowed under our law. In our case, had plaintiffs not filed a formal plea of prescription, the trial judge could have considered the prescriptive title claimed by plaintiffs. The same result must be reached when plaintiffs have filed their plea.
The prohibition against replicatory pleadings is to keep the record from becoming cluttered with unnecessary allegations; it is not to deny a party the right to raise a defense or objection to the other party's contentions.
Defendants were not surprised. The petition put them on notice that possession, including the initial corporeal possession, was at issue. Additionally, the vast majority of testimony by all witnesses concerned the issue of possession and acquisitive prescription.
Plaintiffs prescriptive claims were properly before the trial court.

Pleas of Acquisitive Prescription
LSA-C.C. art. 3479 sets out four basic elements necessary to establish a ten year prescriptive title: 1) good faith on the part of the possessor, 2) a title which shall be legal, and sufficient to transfer the property, 3) possession during the ten years, and 4) an object which may be acquired by prescription.
The nature of the land or the use to which it is destined governs the possession necessary to support prescription. The owner of land can only exercise over it such possession as is practicable. Although marsh lands are subject to physical possession, the possession contemplated by law is that which is commensurate with its nature, its chief value, and is governed by the extent of operations conducted thereon which the character of the soil and surroundings may reasonably permit. Boudreaux v. Olin Industries, 232 La. 405, 94 So.2d 417 (1957); Kelso v. Caffery, 221 La. 1, 58 So.2d 402 (1952); Veltin v. Haas, 207 La. 650, 21 So.2d 862 (1945); Boagni v. Pacific Imp. Co., 111 La. 1063, 36 So. 129 (1904).
The disputed land is primarily marsh land with some timber stand. It was subject to flooding every year. In 1933 the U.S. Corps of Engineers made the Blind Tensas Cut which substantially changed the channeled water flow. Among other things the Blind Tensas Cut took the place of Sawdust Bayou which until 1933 was the approximate east boundary of the disputed tract. After 1933, the Blind Tensas Cut was the east boundary of the north one-third of the disputed tract. The cut was made to a width of some 450 to 600 feet and became one of the better waterways in the Basin. The spoil from the cut was thrown on the west side and became known as the Cat Dump (because the "Cat" dredge was used to make the cut). The spoil extended to a distance of some 200 or more feet from the cut and at places was some 15 feet high. The spoil was used as campsites or homesites for several families who lived in the Basin.
Plaintiffs' most impressive act of possession was established by the deposition of Warren Stockstill who died prior to trial. He testified that he married into the Verret family in 1912 and shortly thereafter verbally contracted with Anatole Verret to cut the merchantable cypress located on the disputed property; that he cut some 50,000 feet of cypress and paid Verret $1.50 per thousand for the stumpage; that he used his share of the proceeds to set up housekeeping with his new bride; and that he and two of Anatole's sons hunted and fished on the disputed lands annually for a period of some ten to fifteen years beginning about 1915.
Melton Verret testified that from 1915 to 1943 his primary occupation was hunting, *94 trapping, fishing, frog catching, and moss picking. He lived in the Basin some six miles from the disputed tract and annually performed these activities on the disputed tract.
It was established by several witnesses that Lillian Ray, one of the Verret descendants, lived on the Cat Dump located on the disputed tract for several years during the thirties. After the cut was made, she cultivated a small garden on the dump and raised some chickens.
This testimony was qualified by the unanimous opinion that all Basin residents considered most land in the Basin available for homesites. Except for a few owners whose land was posted and patrolled, ownership was irrelevant to these residents' rights to use Basin lands for hunting, trapping, fishing, frog catching, moss picking, and as homesites. There is no showing that Lillian Ray knew she was residing on Verret property, or that she claimed the property for herself or for plaintiffs. Several other homes or campsites were located on the same property and there is no suggestion that these other residents sought or obtained permission from the Verrets. Testimony indicates that no Basin resident intended to acquire property by virtue of thirty years adverse possession.
Mr. Stockstill acknowledged that timber had been cut on the disputed tract before his 1913 cut. Tr. 219. He was unable to locate the property line which separated his brother's property from the Verret property, and just assumed that the 200 acres he cut on the south portion of the island belonged to Verret.
Typical of all testimony relating to ownership of lands as relating to the right to hunt, trap, fish, and use the land, Stockstill testified at Tr. 204 that the Verret brothers (with whom he hunted and fished on the south portion of the island) never mentioned to him that they owned the tract. Furthermore, Stockstill took logs from the spoil bank on the disputed tract in 1934, and didn't pay the Verrets for the logs. He testified that the money he got for those logs was probably lost in a crap game (Tr. 209); that when they went hunting, they hunted anywhere they wanted to without regard to ownership of the property (Tr. 211); that it was a friendly community and you didn't ask permission from anyone to use property in the Basin (Tr. 212); that when they hunted, they just went to the best place and hunted (Tr. 214, 228).
Melton Verret admitted that he trapped and hunted all over the island. Tr. 245. Although Melton testified, at times, that he stayed where he belonged (on the Verret property), he also admitted that he couldn't locate the property lines. Tr. 255. At Tr. 260, Melton testified that he trapped on other properties without seeking permission of the landowner, and that no one sought his permission to trap on the Verret land. At Tr. 261, he admitted that no one sought permission to use another's land in the Basin, and that others hunted, fished, trapped, and picked moss on the Verret land without seeking permission.
Plaintiffs' witness Joe Young testified at one time that Lillian Ray lived on the Verret property in the late twenties, then later testified at Tr. 477 that no one was there before the 1933 cut was made. Young didn't know what happened after 1933, but made it clear that everyone used property in the Basin without regard to ownership. Tr. 481, 2.
The first corporeal possession of the disputed tract by plaintiffs' ancestor in title occurred in 1913, some twenty-five years after the land was patented to him, and some seven years after the property had been sold for unpaid taxes. It was established that in the Basin it was not uncommon for timber to be removed without the owner's permission. Hunting, fishing, trapping, and other such acts were not established to have been made as owner. Instead those acts were consistent with the community's understanding that all property *95 in the Basin was available for use without regard to ownership.
We find no manifest error in the trial court determination that plaintiffs failed to establish a ten or thirty year acquirendi prescriptive title.
Having failed to make out their title (LSA-C.C.P. art. 3653[1]), plaintiffs' suit to remove the cloud from title was properly dismissed.
The trial court judgment is affirmed at appellants' costs.
Affirmed.